**David B. STRATTON, Trustee for the Estates of First American Mortgage Company, Inc., etc., Plaintiff,**

**v.**

**Leonard SACKS, etc., et al., Defendants.**

**Civ. No. H–88–614.**

United States District Court, D. Maryland.

May 2, 1989.

Gregory A. Inskip, David J. Baldwin, Stephen C. Norman and Potter, Anderson & Corroon, Wilmington, Del., and Raymond Burke and Freishtat and Sandler, Baltimore, Md., for plaintiff.

Jervis S. Finney, Angus E. Finney and Ober, Kaler, Grimes & Shriver, Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, Chief Judge.

In its opinion in *E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.*, 678 F.Supp. 567 (D.Md.1988) (hereinafter "the *Equitable* Opinion" or "the *Equitable* case"), this Court recounted in some detail the extensive fraudulent activity of Michael H. Clott which led to the bankruptcy of First American Mortgage Company, Inc. (hereinafter "FAMCO") and to Clott's imprisonment on charges of criminal fraud and racketeering. In that case, E.F. Hutton Mortgage Corporation (hereinafter "Hutton"), a large institutional purchaser of mortgage loans from FAMCO, had sued FAMCO's banker, Equitable Bank, N.A. (hereinafter "Equitable"), and Equitable in turn had filed a counterclaim against Hutton. Both Hutton and Equitable had suffered substantial losses as a result of Clott's fraudulent and criminal activity. In the *Equitable* Opinion, this Court granted summary judgment in favor of Equitable as to Hutton's claims asserted in the amended complaint and in favor of Hutton as to Equitable's counterclaim. This Court concluded that the substantial losses sustained by Hutton and by Equitable were caused essentially by Clott's fraudulent conduct and not by the tortious or other wrongful acts of the opposing party. 678 F.Supp. at 571.

In its subsequent opinion in *E.F. Hutton Mortgage Corporation v. Pappas*, 690 F.Supp. 1465 (D.Md.1988) (hereinafter "the *Pappas* Opinion" or "the *Pappas* case), this Court had before it a suit brought by Hutton against the partners of Ernst & Whinney (hereinafter "E & W"), a national accounting firm engaged by FAMCO in 1984 to do accounting work for it. In that case, summary judgment in favor of defendants was also granted. The Court there concluded that Hutton's losses were caused by Clott's fraudulent and criminal conduct and by Hutton's own negligent acts and not by any tortious acts of E & W.

Both the *Equitable* case and the *Pappas* case involved attempts by Hutton, the largest purchaser of loans from FAMCO, to salvage the substantial losses it had sustained as a result of its business dealings with FAMCO. As noted, the *Equitable* case also involved an attempt by FAMCO's banker to recoup its losses. The case now before the Court is somewhat different. In this case, the Trustee in bankruptcy for FAMCO and its subsidiaries is seeking to recover losses sustained by FAMCO itself. Defendants are Leonard Sacks and his accounting firm of Buxbaum.Sacks, P.A. (hereinafter "B & S"). Defendants performed accounting services for FAMCO from 1982 until FAMCO's collapse in November of 1985.

This action was first commenced as an adversary proceeding filed by the Trustee in the United States Bankruptcy Court for the District of Maryland. *In re First American Mortgage Company, Inc.*, Case No. 85–B–1987, Adversary No. 87–0307B. By Order of this Court, reference was withdrawn pursuant to 28 U.S.C. § 157(d).[1] Further proceedings have accordingly been held in this Court.

Two claims are presented by plaintiff. Count One of the complaint seeks a recovery under a theory of negligence, and Count Two alleges a breach of contract by defendants. Plaintiff alleges that as a result of the rendering by B & S of negligent accounting services and as a result of the breach by B & S of its contractual duties, FAMCO has sustained substantial losses.

Following the entry of a Scheduling Order in this case, the parties engaged in discovery, and defendants have now filed a motion for summary judgment pursuant to Rule 56, F.R.Civ.P. Memoranda and numerous affidavits and exhibits have been filed by the parties in support of and in opposition to the pending motion. Oral argument has been heard in open Court. For the reasons to be stated herein, defendants' motion for summary judgment will be granted. After a careful review of the extensive record in this case, this Court has concluded that FAMCO's Trustee is barred from a recovery in this case by the doctrine of contributory negligence and that, in any event, the negligence of defendants was not the proximate cause of the losses sustained by FAMCO.

## I

### *Facts*

Reference is hereby made to the background facts recounted in some detail in the *Equitable* Opinion and also in the *Pappas* Opinion. Certain additional facts pertaining to the work done by B & S for FAMCO or its predecessor will be set forth herein.

In 1979, Clott formed a corporation known as First American Mortgage Company, Inc. (hereinafter "the original FAMCO"). Shortly thereafter, Clott, who owned all of the outstanding stock of the original FAMCO, hired B & S to perform certain corporate accounting work. B & S did not, however, provide audit or review services. In October of 1982, the original FAMCO was renamed MH Mortgage Company, Inc. (hereinafter "MH Mortgage"),[2] and a new corporation bearing the name of First American Mortgage Company, Inc. (referred to throughout this Opinion as "FAMCO") was formed. Additional stockholders joined Clott in the formation of the new FAMCO. Clott at the outset owned 49% of the shares of FAMCO while Paul S. Greenstein, Lee J. Greenstein, Stanley F. Rodbell and Arnold D. Wolfe evenly divided another 49%. Two percent was held by Samuel Kaplan, who later sold his stock to FAMCO which then transferred these shares to Clott. In March of 1984, Clott owned 51% of the outstanding stock of FAMCO while each of the other four stockholders owned 12¼%.

Throughout the corporate life of FAMCO, Clott controlled the corporation and its subsidiaries and affiliates and was the dominant figure in operating and managing its business.[3] All major decisions were made by Clott. At Clott's direction, corporate funds were from time to time transferred to MH Mortgage (and other entities) and eventually into Clott's own pockets. The directors throughout were Clott, his wife,

---

1. Three other suits which were likewise instituted by the Trustee in the Bankruptcy Court as adversary proceedings have also been withdrawn and are currently pending in this Court. *Stratton v. Clott, et al.,* Civil No. H–88–779, *Stratton v. Equitable Bank,* Civil No. H–88–1485, and *Stratton v. Miller,* Civil No. H–89–751.

2. As noted in the *Pappas* Opinion, Clott arranged for the diversion of large sums of money from FAMCO to MH Mortgage, which was wholly owned by him. 690 F.Supp. at 1471–1472.

3. Although during argument counsel for the Trustee questioned whether Clott was the dominant shareholder, the complaint in this case alleges that Clott at all relevant times "controlled FAMCO and its subsidiaries and affiliates." Complaint at Paragraph 31.

Rodbell and Paul Greenstein. Directors other than Clott had little to do with the business operations of FAMCO, and the record here does not indicate that the other directors were aware of the magnitude and extent of the fraudulent activity which was at the very core of FAMCO's corporate existence.

B & S, which had done some accounting work for the original FAMCO, was engaged in October of 1982 to provide various accounting services to the corporation. B & S served in this capacity until FAMCO's collapse in November of 1985. Under the agreement reached with FAMCO, B & S undertook (1) to aid in the preparation of trial working balances from which financial statements would be prepared; (2) to prepare tax returns; (3) to assist in organizing FAMCO's payroll and general ledger; and (4) to provide general advice and management. In addition, B & S explicitly disclaimed any responsibility for disclosing errors, irregularities or illegal activities unless such occurrences were brought to its attention. During the period of its employment, B & S compiled projected income statements based on information supplied by FAMCO personnel, maintained FAMCO's equipment schedules, closed out monthly bank account schedules and prepared trial balances for subsidiary companies. Defendant Sacks himself and employee Rita Abel were the persons primarily responsible for overseeing the accounting work performed by B & S for FAMCO.

Perhaps the most egregious of the many acts of criminal fraud committed by Clott was the practice of double selling mortgages. A mortgage would be sold to an individual or institution and thereafter FAMCO would sell the same mortgage to another individual or institution. *See* 678 F.Supp. at 572. This practice commenced in late 1982 or early 1983 and continued almost up until the time of FAMCO's demise. In early 1983, certain employees of FAMCO suspected that Clott was making double or multiple sales of mortgage loans. Mark Greenberg, then a FAMCO branch manager, brought the matter to Clott's personal attention but was rebuked. Thereafter, Greenberg and Wendy Quade, another FAMCO employee, approached defendant Sacks and discussed their suspicions. Sacks brought the matter to the attention of Clott, and, after being reassured that there was no problem, advised Greenberg and Quade that Clott was not double selling mortgage loans and that any such double sales had been made in error. Greenberg continued to be suspicious but when he met with Sacks and sought to consult with him about the matter a second time, the meeting was broken up by Clott.

American–European Investments, Inc. (hereinafter "A–E") was a corporation which was owned by business associates of Clott and which frequently purchased mortgages from FAMCO. In 1983, FAMCO's books reflected an indebtedness of over $1 million owing to A–E. In September of 1983, Clott wrote Carl Siegel, Vice President of A–E, asking him to confirm that FAMCO had assigned to A–E loans the total value of which was equal to FAMCO's indebtedness. Siegel responded by confirming to Clott that FAMCO did not then have any outstanding indebtedness due and owing to A–E. However, FAMCO's books were not adjusted to reflect this transaction. Pursuant to instructions from FAMCO officers, Sacks directed Rita Abel to make a journal entry reclassifying the obligation as owing to MH rather than to A–E.

From late 1982 through 1984, large sums were diverted by Clott from FAMCO to MH or to holders of MH loans. These diversions, as noted in the *Pappas* Opinion, were discussed in Note H of E & W's audit report. 690 F.Supp. at 1471. During 1983, books and records of FAMCO indicated that funds diverted to MH were transferred through an affiliate of FAMCO, FAM Mortgage Servicing, Inc. (hereinafter "FAM Servicing").[4] However, FAM Servicing was not incorporated until January of 1984, and FAMCO was able to disguise its practice of diverting large sums to MH

---

**4.** As plaintiff has correctly noted, FAM Servicing was not a subsidiary of FAMCO but was owned by Clott and the other stockholders of FAMCO.

or to MH investors by the false book entries in question.

E & W had been retained to audit FAMCO's financial statements for the 1984 fiscal year ending on February 29, 1984. The audited 1984 fiscal year statements were received by FAMCO on or about August 22, 1984. 690 F.Supp. at 1468. B & S was engaged to prepare financial statements for the next 6 month period, ending August 31, 1984. Preparation of such statements was not completed by B & S until December of 1984, and although B & S had requested verification of various transactions from MH Mortgage and FAM Servicing, the information in question was never received before the August 31, 1984 statements were completed.

When FAMCO extended its operations to Florida, Clott formed a subsidiary known as First Coast Mortgage Company (hereinafter "First Coast"). On February 28, 1985, FAMCO requested release of some $1.6 million from Equitable Bank in connection with the purported sale of 70 mortgage loans to First Federal Savings & Loan Association of Brainerd (hereinafter "Brainerd"). The funds were paid from a custodial account maintained at Equitable for purchases made by Brainerd and other institutional investors, and FAMCO's books were adjusted to reflect receipt of $1.6 million from Brainerd for the purchase of these mortgage loans. However, the representation made by an official of FAMCO was false. The mortgage loans in question had not been purchased by Brainerd.[5] In compliance with instructions from officers of FAMCO, Abel reclassified the funds as having been transferred from First Coast rather than from Brainerd. FAMCO's books thus showed an indebtedness of $1.6 million owing to First Coast, a corporate conduit which had been organized by Clott as a subsidiary of FAMCO and which was later sold to business associates of Clott for $1.00.

In early 1985, FAMCO had purchased a $900,000 loan originated by First Coast (the so-called "Hawkins loan"). Thereafter, FAMCO sold the loan to its Self Insured Retention Fund (hereinafter "SIRF"). As noted in the *Equitable* Opinion, SIRF was a fund to be used for the repayment of defaulted loans and was a supplement for the insurance provided by Rockwood Insurance Company. *See* 678 F.Supp. at 578. Abel correctly perceived that SIRF was an insurance fund and was not a purchaser of mortgage loans. The irregularity was brought to the attention of FAMCO officers who instructed Abel to place the loan in the SIRF account nevertheless. Abel did as instructed. At the time of the purchase, the Hawkins loan was in default and the net result was a transfer of some $900,000 from the SIRF account to First Coast.

## II

### *Summary Judgment Principles*

The legal principles pertinent to the granting or denial of a motion for summary judgment are well known and were set forth in some detail in both the *Equitable* Opinion and the *Pappas* Opinion. Nevertheless, it will be helpful for a fuller understanding of the decision reached in this case for the Court to repeat its previous discussion. The question presented here is whether on the record in this case there exists, pursuant to Rule 56, a genuine issue of fact which would entitle plaintiff to present his claims to a jury.

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir. 1967)). In the absence of such a minimal showing, a defendant should not be re-

---

**5.** A suit brought by Brainerd against Equitable in this Court was settled before trial. *First Fed-* *eral Savings & Loan Association of Brainerd, et al. v. Equitable Bank,* Civil No. H–86–301.

quired to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk and Southern Railroad Company,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two recent cases, the Supreme Court has had an opportunity to clarify and expand the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson,* the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The Fourth Circuit discussed in *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126 (4th Cir.1987), the Supreme Court's holdings in *Anderson* and *Catrett.* Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128 (quoting *Celotex, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2553–54).

Applying these principles to the facts of record here, this Court concludes that defendants' motion for summary judgment must be granted. Since the facts of record here "taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### III

#### *Contentions of the Parties*

In opposing the pending motion for summary judgment, plaintiff contends that there is ample evidence in the record from which a jury could conclude that defendants should have known (1) that Clott was causing individual mortgage loans to be sold to more than one investor; (2) that Clott was causing millions of dollars of

FAMCO money to be diverted to his own benefit; and (3) that the FAMCO financial statements prepared by B & S were materially inaccurate and misleading. Plaintiff asserts that defendant Sacks never brought these matters to the attention of any FAMCO shareholder or director other than Clott himself and that, had defendant Sacks done so, major losses to FAMCO would have been averted.

The principal argument advanced by defendants in support of the pending motion for summary judgment is that the admitted fraud and contributory negligence of FAMCO constitutes an absolute bar under Maryland law to the bringing of this action by FAMCO's Trustee in bankruptcy. In addition, defendants assert that they are entitled to summary judgment as a matter of law (1) because the duty owed by B & S to FAMCO as an accountant was circumscribed by its engagement which did not include auditing, challenging or investigating the accounting decisions of FAMCO management; (2) because B & S violated no duty arising in tort or contract; (3) because the conduct of B & S was not causally related to the damage suffered; and (4) because the conduct of Clott and other individuals and business entities constituted an intervening cause of the losses suffered by FAMCO.

It is not necessary in this case to consider in turn each of the arguments presented by the parties in support of and in opposition to the pending motion for summary judgment. The parties agree that the issues are the same under both Count One and Count Two, since plaintiff's breach of contract claim is based on the assertion that defendant B & S negligently performed its contractual obligations.[6] The Court will assume that sufficient evidence exists in this record to raise a genuine issue of fact concerning the alleged negligent acts and omissions of defendants during the period of time that B & S was performing accounting services for FAMCO. Nevertheless, plaintiff Trustee is not entitled to a recovery in this case because

the record here establishes as a matter of law first that FAMCO itself was guilty of contributory negligence which directly contributed to the losses sustained, and second, that in any event, any negligence of defendants was not the proximate cause of FAMCO's losses. In view of the Court's conclusions as to these issues, plaintiff is not entitled on this record to proceed to trial on either of the two counts of the complaint.

## IV

### Contributory Negligence

■ It is well established that a trustee in bankruptcy stands in the shoes of the debtor and has no greater rights than the debtor itself had. *In re Gebco Investment Corp.,* 641 F.2d 143, 146 (3d Cir.1981); *Mutual Life Trust Insurance Co. v. Wemyss,* 309 F.Supp. 1221, 1231 (D.Me.1970). Thus, any defense, legal or equitable, which might have been raised against a debtor may be raised against the trustee. 2 *Collier on Bankruptcy,* § 323.02[4] (15th ed. 1988). Accordingly, if FAMCO was contributorily negligent and if such negligence directly contributed to the losses sustained, there can be no recovery against the defendants even though they may have been guilty of accountant malpractice.

The parties agree that Maryland law is controlling. As noted in the *Pappas* Opinion, Maryland is one of a minority of states in the nation which has not adopted the comparative fault doctrine. *See also Harrison v. Montgomery County Board of Education,* 295 Md. 442, 456 A.2d 894 (1983). As this Court observed in the *Pappas* case (690 F.Supp. at 1475–76):

> Under Maryland law, contributory negligence is an all-or-nothing proposition which completely bars recovery of damages by a person whose fault contributes to that damage, no matter how slight that fault may be. *See, e.g., Jennings v. United States,* 178 F.Supp. 516, 526 (D.Md.1959), *vacated on other grounds,*

---

**6.** As the Court noted in *Cenco v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir.1982), claims of the sort alleged here constitute no

more than "a single form of wrongdoing under different names."

291 F.2d 880 (4th Cir.1961); *Diggs & Klein, Comparative Fault in Maryland: The Time Has Come,* 41 Md.L. Rev. 276 (1982). Thus, any negligence of plaintiff Hutton which directly contributed to its losses will bar a recovery in this case regardless of its ratio or proportion as contrasted with the negligence of defendants. *Jennings, supra* at 526.

Similarly, any negligence of FAMCO which directly contributed to its losses will bar a recovery in this case regardless of the ratio or proportion of such negligence as contrasted with the negligence of defendants. In this particular case, the facts of record establish as a matter of law that Clott and other officers and agents of FAMCO were indeed negligent and that the negligent acts and omissions of these officers and agents performed within the scope of their authority bar plaintiff's recovery.[7]

Besides being the controlling shareholder of FAMCO, Clott was also Chairman, Chief Executive Officer, and the dominant figure in the management of FAMCO's business. Not only Clott but also other officers of FAMCO participated in the extensive fraudulent scheme which caused substantial losses to both large and small investors. As Judge Smalkin said in sentencing Clott to 12½ years imprisonment for the criminal acts committed by him: "I am hard pressed to think of a more wide-ranging fraudulent scheme." *Hutton* Opinion, *supra* at 570.

Much more was involved in Clott's fraudulent scheme besides the widespread double-selling of mortgage loans. FAMCO did not, as required by contractual arrangements, remit prepayments of mortgage loans to Hutton and other investors but retained such amounts for operating purposes. There were numerous misrepresentations made by Clott. 678 F.Supp. at 572. Hutton and other investors were told that the delinquency rate of mortgages was no more than 10% to 12%, when in fact the actual delinquency rate was in excess of 30%. *Id.* There were misrepresentations

made to Equitable which resulted in the improper payment to FAMCO of sums held in custodial accounts. Investors were falsely informed that the Self Insured Reserve Fund (SIRF) was sufficient to cover all of FAMCO's delinquent loans. Funds from SIRF were improperly transferred to FAMCO for the purchase of mortgage loans.

But Clott himself was not the only officer of FAMCO convicted in this Court of a federal crime. Recently, two other FAMCO officers have admitted their guilt in connection with fraudulent acts undertaken by them during the time that they were employed by FAMCO. *United States v. Gaultney, et al.,* Criminal No. JH–88–071. Jerry L. Gaultney was employed by FAMCO in April 1984 and in August of 1984 became President of the corporation. On March 1, 1989, Gaultney pled guilty in this Court to two counts of an indictment charging him with participating in a scheme to defraud two institutions which purchased mortgage loans originated by FAMCO. Thomas J. Polvinale was hired by FAMCO in July 1984 as Chief Financial Officer. He pled guilty on March 1, 1989 to one count of the same indictment which had charged Gaultney with criminal fraud. Polvinale likewise admitted participating in a scheme to defraud an institution which had purchased mortgage loans from FAMCO.

█ Plaintiff himself in his complaint filed in this Court in *Stratton v. Clott, et al.,* Civil No. H–88–779, has acknowledged that other FAMCO employees besides Clott participated in Clott's negligent activities. In that case, plaintiff has sued not only Clott, Polvinale and Gaultney, but also Hennie L. Chase (Vice President, Senior Accountant, Controller and Treasurer), Paul S. Greenstein (a stockholder, director and officer), Lee J. Greenstein (a stockholder and officer), Stanley F. Rodbell (a stockholder, director and officer), Arnold D. Wolfe (a stockholder and officer), Mark J.

---

7. Much more than the negligence of Clott and certain other officers of FAMCO has been established by the record in this case. However, in concluding that FAMCO's contributory negligence is a bar to the bringing of this suit, it is not necessary to analyze the legal effect of the intentional tortious acts of Clott and certain other FAMCO officers.

Greenberg (an officer) and F. Kirkpatrick Lininger (an officer). The complaint in Civil No. H–88–779 charges virtually every director, stockholder and principal officer of FAMCO with gross negligence and breach of fiduciary duty in that each such individual intentionally or recklessly failed to investigate and stop the frauds being perpetrated by Clott.

The parties dispute whether the Trustee's assertions of fact in his complaint in the *Clott* case are binding judicial admissions which estop plaintiff Trustee from denying the truth of such statements in this case. *See Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1167 (4th Cir.1982). It is not necessary on the record here to decide whether plaintiff is judicially estopped from denying that FAMCO's stockholders, directors and principal officers were negligent or breached other duties owed to FAMCO. It is well established in any event that a pleading from a related action is an admission and is evidence of the facts asserted therein. *Trexlar v. Seaboard Systems R.R., Inc.,* 641 F.Supp. 688, 689 (W.D.N.C.1986) (citing *Enquip Inc. v. Smith–McDonald Corp.,* 655 F.2d 115 (7th Cir.1981). Thus, the Trustee's allegations in the *Clott* case may properly be considered by the Court in this case as corroboration of what the record otherwise shows, namely that negligent acts and omissions of many officers and agents of FAMCO directly contributed to the losses which the Trustee seeks to recover in this case.

The parties here vigorously dispute whether the fraudulent acts of Clott, Gaultney and Polvinale can be imputed to the corporation itself. Defendants assert that the doctrine of unclean hands would under Maryland law bar the bringing of this action. *See Schaeffer v. Sterling,* 176 Md. 553, 555, 6 A.2d 254 (1939). Although the clean hands doctrine is an equitable princi-

ple, *see Mas v. Coca Cola,* 163 F.2d 505, 507–08 (4th Cir. 1947), it has been applied by a district court in this Circuit to defeat an action at law. *Buchanan Home & Auto Supply Co., Inc. v. Firestone Tire and Rubber Company,* 544 F.Supp. 242, 245, 247 (D.S.C.1981)[8]; *see also Tempo Music, Inc. v. Myers,* 407 F.2d 503, 507 n. 8 (4th Cir.1969).

Plaintiff denies that Clott's fraudulent conduct is attributable to FAMCO, particularly since many of the acts undertaken by him did not benefit the corporation. However, in this case it is not necessary for the Court in reaching its decision to determine whether the fraud of Clott and other officers can be imputed to the corporation. *See Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 427 F.2d 862, 870 (4th Cir.1970).[9] It is beyond question that an intentional act can give rise to an action in negligence. *McCance v. Lindau,* 63 Md.App. 504, 513, 492 A.2d 1352 (1985). Although wrongful intent need not be proved to establish negligence, the presence of intent to do an act does not preclude negligence. *Ghassemieh v. Schafer,* 52 Md.App. 31, 40, 447 A.2d 84 (1982).

At the very least, Clott, Polvinale, and Gaultney, as well as other officers and employees of FAMCO, did not exercise due care in performing their assigned duties as agents of the corporation. There can be little doubt that the negligent acts of such officers are chargeable to FAMCO itself under the theory of *respondeat superior. Cox v. Prince George's County,* 296 Md. 162, 460 A.2d 1038 (1983). An employer is responsible for the employee's wrongful conduct if done within the scope of his employment and in furtherance of the employer's business, even though done in a wrongful or forbidden manner. *Id.* at 171, 460 A.2d 1038. Where there is no factual dispute and only one reasonable inference can be drawn from the facts, the question

---

**8.** The *Buchanan Home* Opinion was authored by Judge Robert F. Chapman, now a Circuit Judge but then a District Judge.

**9.** Defendants correctly contend that to impute the fraud of Clott to FAMCO under *Phoenix* they need establish merely that Clott was in substan-

tial control of the affairs of the corporation. *See* 427 F.2d at 869. Were it necessary to reach this issue, the record here supports the conclusion that the fraud of Clott and these other officers would indeed be imputed to FAMCO itself.

is one of law for the Court. *Dhanraj v. Potomac Electric Power Co.*, 62 Md.App. 94, 101, 488 A.2d 512 (1985), *aff'd* 305 Md. 623, 506 A.2d 224 (1986).

On this record, this Court concludes as a matter of law that Clott and other principal officers were acting within the scope of their employment and in furtherance of FAMCO's business when they committed the negligent acts in question. That their acts directly contributed to FAMCO's losses is likewise clear. Thus, the doctrine of contributory negligence is a complete bar to any recovery by the Trustee in this case.[10]

In contending that he is not barred in this case by the doctrine of contributory negligence, plaintiff Trustee does not dispute the fact that numerous negligent acts were committed by Clott and other officers of FAMCO. Rather, relying on cases from jurisdictions other than Maryland, plaintiff argues that the contributory negligence of a client is a defense in a suit brought against an accountant only where the client's negligence prevented the accountant from performing his duties. *See Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 345 N.W.2d 300 (1984); *Shapiro v. Glekel,* 380 F.Supp. 1053 (S.D.N.Y. 1974).

Plaintiff concedes that Maryland has not adopted the principle of law relied upon by him in this case. However, even were the rule in other jurisdictions to be adopted by the Court of Appeals of Maryland, its application to the facts here would not avoid the defense of contributory negligence. The cases from other jurisdictions relied upon by plaintiff have recognized that contributory negligence of the client may be a defense where the client has contributed to the accountant's failure to perform the contract of employment and to report the truth. *See Lincoln Grain, Inc. v. Coopers & Lybrand, supra* 345 N.W.2d at 307.

In this particular case, it is apparent that the negligence of Clott and other FAMCO officers and agents did in fact contribute to defendant's failure to properly report financial details. On numerous occasions, Clott and others misrepresented facts to B & S or otherwise caused false information to be entered in FAMCO's books. Such misrepresentations of fact were an essential part of Clott's extensive fraudulent scheme. Diversions to MH and other entities were improperly recorded on FAMCO books at the direction of Clott and other officers. As noted hereinabove, erroneous information relating to the A–E transaction, the Brainerd transaction, the Hawkins loan and the diversions to MH through FAM Servicing was furnished to defendants by Clott and other officers.[11] Vital information concerning corporate operations was continually withheld by Clott who assured defendants that double selling of loans and other irregularities were not occurring.

Thus, substantial negligence and other fault on the part of the client FAMCO has been shown by the record in this case. As the Court observed in *Shapiro v. Glekel, supra* at 1058, such a showing would allow an accounting firm to avoid liability resulting from its own negligence.

The facts here thus lead to the conclusion that as a matter of law FAMCO was itself negligent and that its own negligence was a contributing cause of the losses sustained. If a jury were to find that defendants were negligent in the accounting work performed, plaintiff would not be entitled to a recovery in this case because of FAMCO's own contributory negligence.

## V

### *Proximate Causation*

■ In his complaint, plaintiff Trustee seeks compensatory damages "in an

---

10. The Court of Appeals of Maryland has recognized that the trial court may as a matter of law find a plaintiff contributorily negligent. *Craig v. Greenbelt Consumer Services, Inc.,* 244 Md. 95, 222 A.2d 836 (1966).

11. In an affidavit filed as part of the record in this case, Clott has admitted that during the time that he managed FAMCO's business, he withheld from defendants accounting information and caused Sacks and B & S not to learn information relating to the collectibility of various accounts receivable.

amount to be proven at trial." During argument, counsel for plaintiff conceded that the Trustee would not be entitled to recover from defendants in this case all losses which resulted from the collapse of FAMCO. The recovery sought here is essentially for losses to FAMCO resulting from unjustifiable transfers from the corporation to Clott, to MH Mortgage and to First Coast.

On the record here, this Court finds and concludes that any negligence of defendants is not the proximate cause of those losses. The losses to FAMCO resulting from Clott's diversions were caused essentially by Clott's fraudulent conduct and by the negligence of other officers and agents of FAMCO. No tortious act of defendants caused or contributed to the losses claimed by plaintiff in this suit.

As noted in the *Pappas* Opinion, an issue of proximate cause is ordinarily one to be resolved by the jury. 690 F.Supp. at 1473. However, where the evidence adduced would admit to but one conclusion, the matter may be decided by the Court as a matter of law. *Id.* On the record here, this Court has concluded as a matter of law that plaintiff Trustee cannot prove that defendants' conduct directly caused the damages which plaintiff seeks to recover in this suit.

Plaintiff argues in this case that Sacks and B & S had knowledge of Clott's fraud and other tortious conduct, that defendants had a duty to apprise other stockholders and directors of FAMCO of these irregularities, and that had other stockholders and directors known of Clott's misconduct, they would have prevented the diversions which resulted in the losses in question. Assuming that defendants were negligent in failing to disclose to other stockholders and directors of FAMCO irregularities which came to their attention, it is mere conjecture to conclude that Clott's diversions of funds would thereby have been prevented. Plaintiff has not in this case been able to point to evidence in the record showing

that there is a reasonable probability or reasonable certainty that the acts complained of caused the losses suffered. *See Lustine Chevrolet v. Cadeaux*, 19 Md.App. 30, 36, 308 A.2d 747 (1973).

Clott was the dominant figure throughout the corporate existence of FAMCO. He arranged for the diversions in question as well as for means of disguising them in various ways on the books and records of the corporation. At the same time that he was signing FAMCO checks transferring corporate funds to MH and eventually into his own pockets, he was undertaking the other fraudulent and criminal activities which kept FAMCO in business.[12] Absent the double selling and the many other fraudulent acts of Clott, FAMCO could not have continued its corporate existence.

Clott's fraud was pervasive and infected almost every aspect of FAMCO's operations. Indeed, he was a master in the art of deception and had the ability to deceive many persons and entities, including banks, savings and loan associations, lawyers, auditors and investors. *Pappas, supra*, 690 F.Supp. at 1471. Clott's acts resulted in converting the corporation "into an engine of theft against outsiders." *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d at 454. It is therefore mere speculation to suggest that, if Rodbell and Paul Greenstein (assuming that they in fact did not know of Clott's frauds) had confronted Clott with information supplied by defendants, the diversions would have stopped and (assuming that FAMCO was later rendered insolvent) that the bankruptcy estate would have been increased by the amounts which Clott improperly paid into his own pockets.

Accordingly, this Court concludes that the damages claimed by plaintiff Trustee in this case were not proximately caused by tortious acts of defendants. Rather, the losses in question were caused by Clott's fraud and by the negligence of other officers and agents of the corporation. Although more than one wrongful act can proximately cause or contribute to dam-

---

**12.** Checks transferring the corporate funds in question to MH were signed by either Clott

himself or by Hennie Chase at Clott's direction.

ages sustained by a plaintiff, in this particular case any negligence of defendants did not directly cause or contribute to the losses claimed by plaintiff.

## VI

### Conclusion

For the reasons stated herein, defendants' motion for summary judgment will be granted as to both counts of the complaint. Judgment will accordingly be entered in favor of defendants, with costs. An appropriate Order will be entered by the Court.